William MATOS

v.

**BRISTOL BOARD OF EDUCATION**

No. 3:00CV1587(AHN).

United States District Court, D. Connecticut.

June 4, 2002.

James F. Kane, Anthony V. Zeolla, Gaffney, Kane, Reynolds, Sullivan & Vollmer, New Britain, CT, for Plaintiff.

Michael J. Rose, Alexandria L. Bufford, Howd & Ludorf, Hartford, CT, for Defendant.

*RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

NEVAS, District Judge.

Plaintiff William Matos ("Matos"), a Hispanic male employed as a custodian by the Bristol Board of Education ("the Board"), brings this action pursuant to Title VII for money damages and other relief, claiming that the Board discriminated against him on the basis of his race and in retaliation for his filing charges of discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO").

Specifically, Matos claims that he applied for a promotion to head custodian at the Jennings School in Bristol, Connecticut, and that his race was a motivating factor behind the decision not to offer him that position. Matos also claims that the defendant retaliated against him after he filed claims of illegal discriminatory employment practices with the CHRO.[1]

The defendant has moved for summary judgment on all of the plaintiff's claims. For the following reasons, the defendant's motion (doc. # 18) is GRANTED.

*BACKGROUND*

Matos is a janitor employed by the Bristol Board of Education and has held that position since 1995. In May 1999, Matos and nine other candidates applied for a head custodian position at the Jennings School in Bristol.

Matos is a member of the Collective Bargaining Agreement between the Union and the Board of Education. Pursuant to the terms of the Collective Bargaining Agreement in effect in May 1999, the Board was required to promote the "most senior, qualified applicant." *See* Collective Bargaining Agreement at 7, attached to Def.'s Memo. of Law in Support of Mot. for Summary Judgment as Exh. B; *see also* Pl.'s Depo. at 36, attached to Def.'s Memo. of Law in Support of Mot. for Summary Judgment as Exh. A.

To fill the head custodian position, the Board held an oral examination to determine whether an applicant was qualified,

---

1. Matos also asserted two causes of action under state law, namely: intentional infliction of emotional distress and negligent infliction of emotional distress. At oral argument, counsel for the plaintiff conceded: (1) that Matos' claim for intentional infliction of emotional distress could not be maintained against the Board in light of Conn. Gen.Stat. § 52–557n; and (2) that Matos, who is still employed by the Board and has not been terminated, could not bring a claim for negligent infliction of emotional distress in connection with the Board's failure to promote him, in light of *Perodeau v. City of Hartford*, 259 Conn. 729, 792 A.2d 752 (2002) (barring claim for negligent infliction of emotional distress arising out of conduct occurring in the context of a continuing employment relationship, as distinguished from conduct occurring in the context of the termination of employment). Accordingly, those claims are deemed withdrawn and dismissed.

and then awarded the position to the senior-most applicant who remained in the eligible pool. The Board defined "eligible" as anyone scoring over seventy percent (at least a 56 out of 80) during the interview.

The Board assembled a panel of two administrators to conduct the interviews: Elementary School Principal, Gale Gilmore ("Gilmore"), and the Building Superintendent, Vincent Bartucca ("Bartucca").[2] Matos received a score of 34 out of 80 from Bartucca and 37 out of 80 from Gilmore. Because he scored less than seventy percent, Matos was not considered eligible for the promotion.

Instead, the Board hired Scott Hall ("Hall"), a Caucasian, for the position. Matos conceded during his deposition that Hall had more seniority than him and was at least as qualified for the position:

Q: As of '99, how much seniority did you have?

A: Five years, I think. Four and a half.

Q: And Scott Hall?

A: He had six years.

. . . . .

Q: So as far as you're concerned, Scott Hall was senior over you?

A: Over me, yes.

Q: And with respect to qualifications, do you believe you had more qualifications than Scott Hall?

A: I wouldn't say more, but equal.

See Pl.'s Depo. at 37–38, attached to Def.'s Memo. of Law in Support of Mot. for Summary Judgment as Exh. A; see also id. at 89:

Q: Well, let me ask you this. The bargaining agreement says that the senior qualified person gets the position.

A: Right. Yeah.

Q: So if there's no testing at all, and all the board did was went on who's senior, you wouldn't have gotten the job; correct?

A: Right.

Hall scored an eighty-two percent on the oral examination.

Matos claims that the oral examination was entirely subjective in nature and, in support of his claims, relies upon certain comments made by Bartucca. For example, Matos claims that in 1996, during a conversation including Matos, Bartucca and another co-worker, James Salvatore, Matos commented that there were no Hispanics in supervisory positions. According to Matos, Bartucca responded that Hispanics would never make it because "their kind couldn't pass the test." Matos claims that Bartucca also used the name "Julio" in reference to him on several occasions. Moreover, Matos alleges that when he once asked Bartucca whether he had a chance of becoming a head custodian, Bartucca replied, "not for another 75 years." Matos further claims that Bartucca told him, during a conversation regarding Matos' application for the position of head custodian at the Jennings School, that Bartucca would "make sure [Matos] w[ould] rot in this building."[3]

In June 1999, Matos filed an affidavit of illegal discriminatory practice with the

2. Bartucca was involved in the interview process for the vacant custodian position in 1995 and recommended hiring Matos for that position.

3. Matos ascribes the alleged discriminatory animus to Bartucca alone. Matos claims that the reason he received the same or similar test score from Gilmore, however, was because Bartucca gave Gilmore marching orders about who the Board wanted to hire. See, e.g., Pl.'s Depo. at 37–38, attached to Def.'s Memo. of Law in Support of Mot. for Summary Judgment as Exhibit A ("I don't believe that Gail was racial towards me, but I believe that she was told what to do. She did

CHRO, claiming that the Board discriminated against him when it failed to promote him to the position of head custodian at the Jennings School.

On or about May 13, 2000, Matos was suspended for getting into an argument and swearing at a fellow employee. As a result of the incident, Matos was suspended from work without pay for one day. Matos further claims that he has applied for head custodian positions on at least two occasions since the filing of his CHRO charge and that he has been denied those promotions. Matos has never filed a charge of retaliation with the CHRO.

### STANDARD

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"), *cert. denied*, 506 U.S. 965, 113 S.Ct. 440, 121

L.Ed.2d 359 (1992). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but rather must present significant probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.1995).

The Second Circuit has stated that a district court should exercise particular caution when deciding whether summary judgment should issue in an employment discrimination case. *Carlton v. Mystic Transportation, Inc.*, 202 F.3d 129, 134 (2d Cir.), *cert. denied*, 530 U.S. 1261, 120 S.Ct. 2718, 147 L.Ed.2d 983 (2000); *Gallo v. Prudential Residential Services, Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir. 1994). In particular, at the summary judgment stage when intent is at issue, the court must carefully scrutinize the depositions and affidavits for circumstantial evidence that if believed, would show discrimination. *Gallo*, 22 F.3d at 1223. Even in these cases, however, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgement." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997). Instead, the plaintiff "must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14 (2d Cir.1995).

### DISCUSSION

A. *Title VII—Discrimination Claim*

The Board argues that Matos has failed to establish a prima facie case of discrimi-

---

tell me that Vinnie did call her and Vinnie did say 'I want you to look into a certain individual for this job.' And she did tell me that she liked Scott Hall. So it—I don't believe there was any racism on her part. But I believe that she was—I believe that somehow Vinnie and the Board, or the Board, you know, wanted this for him, for Scott Hall, and he got the job.").

nation because he was not qualified for the head custodian position. The court agrees.

A Title VII claim for discrimination is evaluated under the familiar burden-shifting rules established by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ First, the plaintiff must establish a prima facie case of discrimination by showing that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *Weinstock, v. Columbia University*, 224 F.3d 33, 42 (2d Cir.)(citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817). This is a minimal burden. *See, e.g., James v. New York Racing Assoc.*, 233 F.3d 149, 153 (2d Cir.2000).

Second, once the plaintiff has established a prima facie case, the burden of production is then on the employer to proffer a legitimate, non-discriminatory reason for its action. *See, e.g., James*, 233 F.3d at 153. If the employer does not come forward with a legitimate non-discriminatory reason then the plaintiff who proves the minimal prima facie case is entitled to prevail as a matter of law. *Id.* at 154 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–10, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

Third, once the employer has articulated a legitimate, non-discriminatory reason, it would be entitled to summary judgment unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination—in other words, that the defendant's proffered non-discriminatory reason is a pretext for unlawful discrimination. *See, e.g., James* 233 F.3d at 154 (citing *St. Mary's*, at 510–11, 113 S.Ct. 2742).

■ The United States Supreme Court has further held that under the last step of the three-step *McDonnell–Douglas* burden-shifting analysis, the plaintiff does not always need to "introduce additional, independent evidence of discrimination." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The plaintiff may attempt to show discrimination by "showing that the employer's proffered explanation is unworthy of credence." *Id.* at 143, 120 S.Ct. 2097. "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.* at 147, 120 S.Ct. 2097. "Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.*

■ Applying these principles here, Matos cannot establish a prima facie case of discrimination because he cannot establish that he was "qualified" for the head custodian position for which he applied.

As set forth above, it is undisputed that the collective bargaining agreement required that the Board hire the most senior, qualified candidate. It is further undisputed that Hall, the individual who was awarded the position, had more seniority than the plaintiff: Matos testified that he had between four and a half and five years of experience while Hall had six. *See* Pl.'s Depo. at 37–38, attached to Def.'s Memo. of Law in Support of Mot. for Summary Judgment as Exh. A. Because the collective bargaining agreement required the Board to hire the most senior, qualified applicant, the Board could not have given Matos the promotion over Hall. To that degree, and on this record, the oral examination is somewhat irrelevant—even if Ma-

tos had received a score of seventy percent or higher, it is undisputed that Hall had more seniority than Matos and would still have received the position over the plaintiff. In other words, under the terms of the collective bargaining agreement, even if Matos had outscored Hall on the oral examination, the plaintiff would not have received the position because Hall was the more senior candidate.

Indeed, under the terms of the collective bargaining agreement, the only way Matos could have conceivably received the position over Hall was if Hall was *unqualified* for the position or was somehow improperly deemed qualified for consideration.[4] There is nothing in the record, however, to support this contention. The plaintiff admittedly did not depose Bartucca or Gilmore, nor did he depose Hall to inquire about his qualifications. Indeed, there is nothing in the record to even indicate what questions were asked of the candidates during the oral examination.[5]

Perhaps more importantly, the *only* evidence in the record belies the plaintiff's claim that Hall was not qualified and, indeed, that evidence comes from the plaintiff himself. Matos testified during his deposition that Hall not only had more seniority than him, but was at least as qualified for the position:

Q: And with respect to qualifications, do you believe you had more qualifications than Scott Hall?

A: I wouldn't say more, but equal.

*See* Pl.'s Depo. at 37–38, attached to Def.'s Memo. of Law in Support of Mot. for Summary Judgment as Exh. A; *see also id.* at 89:

Q: Well, let me ask you this. The bargaining agreement says that the senior qualified person gets the position.

A: Right. Yeah.

Q: So if there's no testing at all, and all the board did was went on who's senior, you wouldn't have gotten the job; correct?

A: Right.

Because it is undisputed that: (1) the collective bargaining agreement required the Board to hire the senior, most qualified applicant; and (2) that Hall was senior to Matos and "equally" qualified, Matos cannot establish that he was qualified for the position and the Board is entitled to summary judgment on that claim.[6]

## B.  *Title VII—Retaliation*

The Board argues that it is also entitled to summary judgment on Matos' claim that the Board retaliated against him after he

4. Because Hall would have had more seniority than Matos even if Matos had passed the oral examination, counsel for the plaintiff conceded at oral argument that the plaintiff's position was, in fact, that Hall was *unqualified* for the position.

5. Accordingly, there is nothing to support the plaintiff's bare contention that the oral examination was *subjective* in nature. Because there is nothing in the record about the questions that the candidates were asked, it is entirely possible that the questions were *objective* in nature. (e.g., "What is the sum of two plus two?"). Had the plaintiff taken discovery on that issue, it is entirely possible that he could have established a genuine issue of

material fact—for example, whether the candidates were in fact asked different questions or whether different decision makers asked different questions, etc. Had the plaintiff deposed certain individuals, it is also possible that he could have raised genuine issues of material fact about Hall's qualifications as well. In short, had discovery been taken on these topics, the plaintiff may have created a genuine issue of material fact sufficient to survive summary judgment.

6. Even assuming Matos could establish his prima facie case, the Board has set forth a legitimate, non-discriminatory reason for promoting Hall over Matos—namely, compliance with the collective bargaining agreement.

filed charges of discrimination with the CHRO.

Title VII provides that it "shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [such employee] has opposed any practice made an unlawful practice by this subchapter." 42 U.S.C. § 2000e–3(a). In essence, Matos's Title VII retaliation claim is that the Board violated this provision by retaliating against him after he filed charges of discrimination with the CHRO for the alleged failure to promote him to the head custodian position.

### 1. *Exhaustion*

■ The Board argues that, because Matos has never filed a charge of retaliation with the CHRO, it is entitled to summary judgment because he has failed to exhaust his administrative remedies. The court disagrees.

■ The Second Circuit has repeatedly recognized that "claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are 'reasonably related' to those that were filed with the agency." *Shah v. N.Y. State Dep't of Civil Serv.*, 168 F.3d 610, 613 (2d Cir.1999); *see also Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir.2001); *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1208 (2d Cir.1993); *Butts v. N.Y. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir.1993), *superseded by statute on other grounds as stated in Hawkins v. 1115 Legal Service Care*, 163 F.3d 684 (2d Cir.1998); *Joseph v. America Works, Inc.*, No. 01 Civ. 8287(DC), 2002 WL 1033833 at *5 (S.D.N.Y. May 21, 2002); *Skeete v. IVF America, Inc.*, 972 F.Supp. 206, 210 (S.D.N.Y.1997). A claim alleging retaliation by an employer against an employee for filing a discrimination charge is one type of claim the Second Circuit has recog-

nized as "reasonably related" to the underlying discrimination charge. *See Legnani*, 274 F.3d at 686; *Shah*, 168 F.3d at 614 (quoting *Butts*, 990 F.2d at 1402); *accord Malarkey*, 983 F.2d at 1208–09; *see also Joseph*, 2002 WL 1033833 at *5 ("In describing the types of claims that are generally considered to be 'reasonably related' to a previous EEOC filing, the Second Circuit has listed claims 'alleging retaliation by an employer against an employee for filing an EEOC charge.'"); *Nonnenmann v. City of New York*, 174 F.Supp.2d 121, 130 (S.D.N.Y.2001).

In the present case, Matos' complaint alleges that the Board retaliated against him for his filing the underlying charges of discrimination with the CHRO. Because Matos' retaliation claim is reasonably related to his initial discrimination charge, he was not required to file a second charge with the CHRO for that claim. *See, e.g., Legnani*, 274 F.3d at 686–87.

### 2. *The Merits*

■ A Title VII retaliation claim is also evaluated under the familiar burden-shifting rules established by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In the context of a motion for summary judgment, the plaintiff must first demonstrate a prima facie case of retaliation, after which the defendant has the burden of pointing to evidence that there was a legitimate, non-retaliatory reason for the action of which the plaintiff complains. If the defendant meets its burden of production, the plaintiff must then demonstrate that there is sufficient potential proof for a reasonable jury to find that the proffered legitimate reason is merely a pretext for impermissible retaliation. *See, e.g., Richardson v. New York State Department of Correctional Service*, 180 F.3d 426, 443 (2d Cir.1999). The defendant

claims that Matos has failed to establish a prima facie case of retaliation.

■ To establish a prima facie case of retaliation, Matos must show that: (1) he was engaged in a protected activity; (2) his employer was aware of his participation in the protected activity; (3) the employer took adverse action against him; and (4) there was a causal connection between the protected activity and the adverse employment action. *Id.; see also Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 66 (2d Cir.1998); *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 713 (2d Cir.1996); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995); *Ericson v. City of Meriden,* 113 F.Supp.2d 276, 288 (D.Conn.2000). The plaintiff's burden to establish a prima facie case is de minimis. *See Donato v. Plainview–Old Bethpage Central School District,* 96 F.3d 623, 633 (2d Cir.1996); *Tomka,* 66 F.3d at 1308.

Matos identifies his May 2000 suspension and the Board's failure to promote him to a head custodian position on two occasions after the filing of his CHRO charge as evidence of the Board's retaliatory conduct. Viewing the evidence submitted in the light most favorable to the plaintiff, however, the court finds that Matos has failed to make a showing sufficient to establish the required nexus between these incidents and his past protected activity.

■ "A causal connection may be established either 'indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant.'" *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991) (quoting *DeCintio v. Westchester County Medical Center,* 821 F.2d 111, 115 (2d Cir.)), *cert. denied,* 484 U.S. 965, 108 S.Ct.

455, 98 L.Ed.2d 395 (1987); *see also Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990). Here, the plaintiff's evidence of retaliation fails to demonstrate, in any of these ways, the required causal connection.

■ First, Matos has failed to establish a causal connection through circumstantial evidence that the filing of his CHRO charges was followed closely by discriminatory treatment. Such circumstantial evidence commonly takes the form of a "showing that the protected activity was closely followed in time by the adverse action." *Manoharan v. Columbia U. Col. of Phys. & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988). If the time that elapses between the protected activity and the adverse action is short enough, nothing more is necessary to satisfy the causation prong. *See, e.g., Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998) (finding that an employee discharged less than two months after filing a complaint with employer and ten days after filing complaint with commission had established a causal connection); *Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1178 (2d Cir.1996) finding an inference of causation where twelve days elapsed between complaint and discharge.

There is no evidence to suggest that the incidents on which Matos, relies, however, were proximate in time to the filing of his CHRO complaint. It is undisputed that Matos filed his affidavit of illegal discriminatory practice with the CHRO in June 1999. It was not until May 13, 2000—approximately one year later—that Matos was suspended without pay for one day after getting into an argument and swearing at a fellow employee. Similarly, there is no evidence to suggest that the Board's failure to promote Matos on subsequent applications for head custodian positions followed closely on the heels of his CHRO

filing. Indeed, Matos' letter to the Board stating that he would not test for the head custodian position at Green Hills Elementary School is dated June 5, 2000—also almost one year after his CHRO filing.

 Second, Matos has failed to establish a causal connection directly through evidence of retaliatory animus directed against him by the defendant. For example, Matos' evidence of alleged statements made by Bartucca all *pre-date* the filing of his CHRO charge. Although the alleged statements by Bartucca that Matos would never make it because "their kind couldn't pass the test;" that Matos would not be a head custodian "for another 75 years;" and that Bartucca would "make sure [Matos] w[ould] rot in this building" could arguably establish retaliatory animus, it is undisputed that all of these comments were made *prior* to Matos' CHRO filing in June 1999. *See, e.g.,* Pl.'s Memo of Law in Support of Pl., William Matos', Obj. to Def., Bristol Board of Education's, Mot. for Summary Judgment at 2 (*"Prior to the oral examination* ... Mr. Bartucca responded that Hispanics will never make it 'because you guys can't pass the test.' " .... "On another occasion and *prior to June [ ], 1999,* Mr. Bartucca told Mr. Matos that he would 'make sure you will rot in this building.' ") (emphasis added); *see id.* at 8 (Comment that Matos would not become head custodian "for another 75 years" made during the same conversation in which Bartucca told Matos that "his kind would never make it;"); *see also* Affid. of William Matos, attached to Pl., William Matos', Obj. to Def., Bristol Board of Education's, Mot. for Summary Judgment as Exh. D (statements that "your kind will never make it;" that Hispanics could not pass the test; that Matos would "rot in the building" and references to Julio all made "prior to June [ ], 1999."). As a matter of law, these statements cannot serve as evidence of retaliation against Matos for his filing a CHRO complaint, because, according to the plaintiff, they were all made prior to the filing of that complaint.

In short, Matos has failed to establish sufficient evidence from which a reasonable jury could find that the Board took any specific action against him as a result of his filing his charge with the CHRO. Accordingly, Matos has failed to establish the causal connection element of his prima facie case and the Board is entitled to summary judgment on his Title VII claim of retaliation.

### CONCLUSION

For the reasons set forth above, the Board's Motion for Summary Judgment (doc. # 18) is GRANTED and the clerk is instructed to close the file.